UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

**CRIMINAL ACTION NO. 21-66-DLB-CJS**

**UNITED STATES OF AMERICA**                                                                             **PLAINTIFF**

**v.**                                       **REPORT AND RECOMMENDATION**

**KYLE A. VANDERPOOL**                                                     **DEFENDANT**

\* \* \* \* \* \* \* \* \* \*

This matter is before the Court on Defendant Kyle Vanderpool's Motion to Suppress (R. 19) and the United States's Response (R. 26). The Court held a two-part evidentiary hearing on October 11, 2022 (R. 57) and November 29, 2022 (R. 64), after which the parties agreed to file post-hearing briefs. (*See* R. 68; R. 69). The Motion is now ripe for consideration and preparation of a Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(B).[1] For the reasons discussed below, it will be recommended that the Motion to Suppress (R. 19) be denied.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**[2]

**A.    Vanderpool's Arrest**

In July 2021, Cincinnati DEA Agents were alerted by the Columbus office that a subject under investigation for drug trafficking in Columbus was traveling to the Northern Kentucky area for purposes of an alleged drug transaction. (R. 62 at Page ID 220). The Columbus target was observed meeting with someone at a residence on Hulbert Avenue in Erlanger, Kentucky, later

---

[1] *See United States v. Quinney*, 238 F. App'x 150, 152 (6th Cir. 2007) (citing *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001) (characterizing a motion to suppress as dispositive)).

[2] The factual circumstances presented here are taken from the transcripts of testimony from the two-part evidentiary hearing held on October 11, 2022 (R. 62) and November 29, 2022 (R. 66).

identified as Vanderpool. (*Id.* at Page ID 241). On July 26, 2021, agents followed the Columbus target to an apartment building in Newport, Kentucky, and observed the target entering the building with Vanderpool. (*Id.* at Page ID 247). The agents then followed Vanderpool to downtown Cincinnati where he was observed circling a block and stopping in the street to drop off a passenger. (*Id.*). Agents testified that they suspected a drug transaction had occurred based on their previous training and experience, where dealers will typically pick someone up for a short period of time, drive a short distance, and drop the person off after completing the exchange. (*Id.* at 251-52). Agents then observed Vanderpool return to Erlanger, Kentucky, and enter a Kroger. (*Id.* at 252). At that point, agents contacted local police and requested that they follow Vanderpool and pull him over if they observed a traffic violation. (*Id.*).

Sergeant Kyle Thornberry testified that he and Officer Glenn Hartke responded to the request and ran the license plate for the vehicle Vanderpool was operating in the Kentucky database. (*Id.* at Page ID 283). The license plate returned a warrant for arrest of the registered owner of the vehicle, which was not Vanderpool, and a notation to verify the vehicle's proof of insurance. As Vanderpool left Kroger, Officer Hartke testified that he observed Vanderpool fail to signal twice when leaving the Kroger parking lot and initiated a traffic stop on that basis. (*Id.* at Page ID 305). Hartke testified that as he was approaching the stopped vehicle, he noticed Vanderpool reach down behind the passenger seat, reach under the passenger seat, and reach into the center console of the vehicle. (*Id.*). Hartke testified that he was concerned for his safety as these motions were consistent with someone hiding evidence or reaching for a weapon. (*Id.* at Page ID 305-06). Hartke then ordered Vanderpool out of the vehicle and when Vanderpool did not comply, he removed Vanderpool from the vehicle with the assistance of Thornberry. (*Id.* at 306-07).

After Vanderpool was removed from the vehicle, he gave Hartke an Ohio driver's license and stated that he lived at the Erlanger address on Hulbert that DEA agents had surveilled previously. (*Id.* at Page ID 287). Vanderpool told the officers that he had lived at the address for two years but failed to obtain a Kentucky driver's license. (*Id.* at Page ID 307-08). Thornberry ran the Ohio license through his dispatch system and was notified that the license had been flagged for failure to reinstate. (*Id.* at Page ID 288).

Hartke then initiated an open-air sniff of the vehicle with his K-9 while Thornberry patted down Vanderpool's person for weapons. (*Id.* at Page ID 308). Hartke notified Thornberry and Vanderpool that the K-9 alerted to presence of controlled substances in the vehicle. (*Id.* at Page ID 288). After the alert, Hartke placed Vanderpool in handcuffs and searched his person. (*Id.* at Page ID 309). Vanderpool was placed in the back of Thornberry's squad car while Hartke and Thornberry conducted a search of Vanderpool's vehicle. (*Id.*). The officers discovered roughly $26,000 in cash and multiple packages of controlled substances in a backpack in the back seat of the vehicle, including LSD, MDMA, DMT, and ketamine. (*Id.* at Page ID 265). Following the search, the officers placed Vanderpool under arrest. (*Id.* at Page ID 288).

Vanderpool was indicted in this Court on December 9, 2021 for posession with intent to distribute a substance containing LSD, MDMA, DMT, and ketamine in violation of 21 U.S.C. § 841(a)(1)-(4). (R. 4). Vanderpool initially faced state charges until January 4, 2022, when the Kenton Circuit Court granted a motion by the Commonwealth to dismiss the charges in lieu of a federal indictment. *See Commonwealth v. Vanderpool*, No. 121-CR-01257, Kenton Circuit Court, Kenton County, Kentucky (CourtNet Docket).[3]

---

[3] In the present analysis, the Court uses the dates contained within the docket in Vanderpool's underlying criminal case which was obtained using CourtNet 2.0. The Court takes judicial notice of this court docket. *See Chase v. Macauley,* 971 F.3d 582, 587 n.1 (6th Cir. 2020) (taking judicial notice of

### B. Motion to Suppress and Evidentiary Hearing

On February 24, 2022, Vanderpool filed the instant Motion to Suppress, alleging that the officers had exceeded the scope of the initial traffic stop and impermissibly prolonged his detention in violation of Vanderpool's Fourth Amendment rights. (R. 19). Vanderpool also alleges that the canine team was not properly trained and certified, and the alert to narcotics was not sufficiently reliable to establish probable cause. (*Id.*). The United States responded to the Motion, insisting the officers had both reasonable suspicion and probable cause to carry on with the search. (R. 26).

A a two-part evidentiary hearing was held on Vanderpool's Motion on October 11, 2022 (R. 57) and November 19, 2022 (R. 64). In the first part of the hearing, Vanderpool focused his questioning of Officer Hartke on the validity of the K-9 sniff based on how the dog reacted before the search of Vanderpool's vehicle, noting the difference between a K-9 "alert" and an "indication." (R. 62 at Page ID 322). Officer Hartke agreed to a characterization by defense counsel that an alert is "a naturally occurring reaction or change from a dog when they are near the source odor such as a difference in breathing, gait, tail carriage, and body posture." (*Id.*). Hartke further elaborated that an alert is "an *untrained* response to a trained odor." (*Id.*) (emphasis added). He agreed that an indication or a final response is "a *trained* response to the trained odor, meaning the dog demonstrates the behavior to the presence or odor of a narcotic." (*Id.* at Page ID 322-23) (emphasis added). He explained that each dog has an individual indication depending on their handler, and a dog can passively indicate (e.g., sit, lie down) or actively indicate (e.g., scratch, bite, or lick). (*Id.* at Page ID 323-24).

---

information from another court's website in a § 2254 case) (citing *Lyons v. Stovall,* 188 F.3d 327, 332 n.3 (6th Cir. 1999) ("[F]ederal courts may take judicial notice of proceedings in other courts of record.")).

Vanderpool also questioned Hartke about the K-9's training. (*Id.* at Page ID 326-30). Hartke explained how his K-9 was trained at Shallow Creek Kennels located in Pennsylvania. (*Id.* at 319). Hartke walked through his K-9 training logs and explained how the training exercises were performed. (*Id.* at 333-35). At Shallow Creek, his K-9 was trained to detect marijuana, cocaine, heroin, methamphetamine, and their derivatives. (*Id.* at Page ID 344). Vanderpool asked Hartke if the K-9 was also trained to detect DMT, MDMA, LSD, or ecstasy, and Hartke responded that the K-9 was not. (*Id.*). Hartke then went on to explain how his K-9 was trained to search, and the duration of those exercises. (*Id.* at 349-52). Hartke explained how his K-9 is typically rewarded with a ball when he finds drugs in training exercises, but that he never rewarded his K-9 during "deployment," or in the field. (*Id.* at 348). The Court concluded the first part of the evidentiary hearing at this time, and Officer Hartke was made available to testify at the second part on November 29, 2022. (*Id.* at Page ID 352-56).

At the second part of the evidentiary hearing, Vanderpool continued cross-examination of Officer Hartke. (R. 66 at Page ID 364). After reviewing the remainder of Hartke's K-9 training materials, he was questioned about the procedure for searching a vehicle. (*Id.* at Page ID 381). Hartke testified that he was trained that in a typical vehicle search, he and the K-9 perform a "cursory" or "initial pass-by" around the vehicle, and then a detailed search. (*Id.*). Counsel played the body camera footage and reviewed it with Hartke, noting the specific movements the K-9 made. (*Id.* at Page ID 383). Hartke testified that he performed a cursory pass and then a detailed search consistent with his training, and noted behavior changes in the K-9 at the driver's side door. (*Id.* at Page ID 385). Hartke noted that the K-9 changed his breathing and his tail posture when he was by the driver's side door, but it was not visible in the video. (*Id.* at Page ID 386). Hartke noted that the K-9 was "going high" without being directed, demonstrating a change in behavior

because the K-9 was changing the search pattern on his own. (*Id.*). At a certain point in the body camera footage, the K-9 was moving away from the vehicle and Hartke tightened his leash to direct him back to it. (*Id.* at Page ID 387). Vanderpool questioned whether that meant the K-9 had lost interest in the search, and Hartke disagreed. (*Id.*). Hartke noted that the previous change in behavior would be enough to permit him to search the vehicle, but that he was re-directing the K-9 to perform a more detailed search. (*Id.* at Page ID 388-389). Hartke confirmed that the K-9 did not indicate during the search. (*Id.*).

On redirect examination, Hartke clarified some of his answers on cross, stating that in addition to the substances found in Vanderpool's vehicle, marijuana was located.[4] (*Id.* at Page ID 395). Hartke also stated that MDMA is a derivative of methamphetamine, a drug his K-9 is trained to detect. (*Id.* at Page ID 396). He noted that it would not be unusual for the K-9 to display multiple alerts without an indication, and when drugs are inside a vehicle, the K-9 has a more difficult time placing the source of the drugs. (*Id.* at Page ID 397-400). Therefore, a K-9 will not indicate without getting inside the vehicle, which is too dangerous a situation to place the K-9 in. (*Id.*). Hartke stated that based on his training and experience, multiple alerts on the subject of a source is sufficient to establish probable cause that a vehicle contains the odor of a controlled substance. (*Id.* at Page ID 402). Hartke clarified that his K-9 has never had a "false negative" search, and his K-9 has a 95% success rate where the K-9 has given alert behavior and drugs have been seized or "evidence, statements, or some sort of independent confirmation that the odor of drugs was in the location of the search." (*Id.* at Page 403-04).

At the second part of the hearing, Vanderpool introduced an expert witness, Kyle Heyen. (*Id.* at Page ID 412). Heyen owns Detector Dogs International, a consulting business for issues

---

[4] Vanderpool has not been charged with any offenses related to marijuana in this case. (*See* R. 4).

6

with police dogs. (*Id*). He has previous experience as a law enforcement officer and a K-9 handler, before moving into the training and instruction of K-9 officers. (*Id.* at Page ID 414). The Court received Heyen as an expert witness in the field of drug detection dogs based on his experience. (*Id.* at Page ID 418). Heyen described the differences between passive and aggressive alerts, and different types of passive alerts that he has observed in drug dogs in his experience. (*Id.* at Page ID 420-22). He noted that his opinions were based on SWGDOG (Scientific Working Group on Dog and Orthogonal Detector Guidelines), a collaborative effort funded by the Federal Bureau of Investigation, the National Institute of Justice, and the Department of Homeland Security to develop best practices for training police service dogs. (*Id.* at Page 431).

Heyen opined that a trained, reliable drug dog should be trained with distraction odors so that they only alert to odors of the drugs they are trained to find; the dog should work to the "point of origin" of the smell they are detecting; and the dog should stay in the indication until the handler removes them from the situation. (*Id.* at Page ID 424-25). Heyen also focused on the reward system used by Officer Hartke and his K-9. (*Id.* at Page ID 430-31). Heyen noted that the method of giving the dog a ball or treat after he indicates teaches the dog that "all [the dog has] to do is indicate and [the dog gets a] reward." (*Id.* at Page ID 431).

Heyen reviewed the Shallow Creek Kennel training logs and opined that the program is flawed because the dogs are not trained on indication, or any specific training exercise to make the dog sit when it finds the source of the drug odor. (*Id.* at Page ID 433). He also noted the lack of specificity in the reports about the K-9's behaviors during the training exercises. (*Id.*). Based on recommendations from SWGDOG, Heyen opined that over the time period of the records that he reviewed, the dogs should have been trained in drug detection for a total of 60 hours, and the reports from Shallow Creek Kennels indicated that Officer Hartke and his K-9 trained for a little

7

over 9 hours. (*Id.* at Page ID 435). Heyen testified that the reports showed no evidence of distraction odor training, meaning that the K-9 could have been alerting to the smell of a dead animal the vehicle had encountered or any other number of smells. (*Id.* at Page ID 435-46). He also called into question the final certification exam that Officer Hartke and his K-9 participated in, and the declining rate of the K-9's indication in Hartke's reports from field deployment following his certification. (*Id.* at Page ID 436-45).

With respect to the specific dog sniff in Vanderpool's case, Heyen opined that based on his review of the body camera footage, the K-9 did not show any of the signs that he looks for in an "intense, well-trained" dog. (*Id.* at Page ID 449). Heyen testified that typically, drug dogs will narrow their focus as they approach the source of the odor and increase their intensity, like dragging the officer to the source of the odor. (*Id.* at Page ID 450). Heyen opined that the K-9's attempt to leave the area twice was further indication of the lack of behavior changes he would expect in a drug sniff. (*Id.* at Page ID 451). He opined that the K-9 did not display any "pinpointing" or "fixated" behavior, where the K-9 would pick up on the smell of the drugs and trace it back to its source, and refuse to leave the spot because they have identified the source. (*Id.* at Page ID 454). Heyen opined that based on the body camera footage, the K-9 did not display alert behavior and that Officer Hartke and his K-9 "did not perform to the minimum standards of a well-trained, reliable drug dog team." (*Id.* at 463-64).

On cross-examination, the United States confirmed that Heyen had not been certified by any national police dog organizations since 1991. (*Id.* at 475-77). Heyen also stated that he does not follow the standards of national organizations regarding drug dog certifications because he does not agree with their methodology. (*Id.* at Page ID 477). Instead, he stated that he follows the standards of the German police, an "internationally recognized" standard. (*Id.*). The United States

8

also questioned Heyen about whether he could list any organizations that adopted the SWGDOG recommended standards, and he could not. (*Id.* at Page ID 496-97).

In rebuttal to Vanderpool's expert, the United States called John Brannon, the President of Shallow Creek Kennels and a former police officer with approximately 30 years of law enforcement experience and approximately 20 years of field training experience. (*Id.* at Page ID 527-28). Brannon was a K-9 handler for 29 years until his retirement in 2016. (*Id.* at Page ID 528). Brannon testified to the validity of the North American Police Work Dog Association ("NAPWDA") standards and the reliability of alert behavior by a K-9 even if the K-9 does not indicate. (*Id.* at Page ID 532-36). Brannon opined that the handler of the K-9 is in the best position to recognize the alert behavior of a K-9 due to the closeness of their relationship and training, and that an indication is not required for a handler to be aware that the dog has detected the odor of the trained substances. (*Id.* at Page ID 535). On cross-examination, Vanderpool discussed the Shallow Creek training logs with Brannon and confirmed that he was not testifying as to the reliability of the K-9's alert for this case specifically, but instead, K-9 behavior generally. (*Id.* at Page ID 546).

Following this testimony, the Court concluded the evidentiary hearing. After the transcripts were completed for each part of the evidentiary hearing (R. 62; R. 66), the parties filed post-hearing briefs. (*See* R. 68; R. 69). The matter is now ripe for consideration.

## II.   ANALYSIS

In Vanderpool's post-hearing Memorandum in Support of his Motion to Suppress, he argues that under *Rodriguez v. United States*, 575 U.S. 348 (2015), a traffic stop cannot be prolonged beyond the time necessary to complete the stop's mission. (R. 68 at Page ID 568). He argues that the stop's mission here was to investigate his failure to signal and, perhaps, his expired

9

license. (*Id.* at Page ID 570). The K-9 dog sniff had nothing to do with that mission, argues Vanderpool, so the dog sniff impermissibly prolonged the stop. (*Id.*).

Alternatively, Vanderpool argues that even if the dog sniff did not impermissibly prolong the stop, the K-9's behavior did not provide probable cause to search the vehicle. (*Id.* at Page ID 573). He argues that while it is presumed that an alert from a certified K-9 creates probable cause, that presumption is rebuttable. (*Id.* at Page ID 570, 577). Vanderpool argues that the K-9's behaviors lacked indicia of reliability because the K-9 was not narrowed in or focused on the vehicle and had to be redirected several times to complete the sniff. (*Id.* at Page ID 576-77).

In its Response, the United States argues that the officers stopped Vanderpool's vehicle based on information they received from the DEA agents, and the real purpose of the stop was not to investigate the traffic violations, but instead to conduct a drug investigation. (R. 69 at Page ID 590). The United States argues that Vanderpool's movement inside the vehicle and his refusal to comply with instructions escalated the stop and allowed the officers to search the vehicle. (*Id.*). Additionally, the Government argues that the dog sniff was prompt and performed by a certified drug dog, so his alert gave the officers probable cause to search the vehicle. (*Id.* at Page ID 591).

### A. Validity of Traffic Stop

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . and effects against unreasonable searches and seizures. U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). The reasonableness of the stop is contingent upon whether police have probable cause to believe that a traffic violation has occurred. *Id.* at 810. "[A] seizure that is lawful at its inception can violate the Fourth Amendment

10

if its manner of execution unreasonably infringes interests protected by the Constitution." *United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). A lawful traffic stop must therefore be limited in scope and duration, and if an officer exceeds the scope or duration of the traffic stop, the officer must have "reasonable suspicion" to continue the stop on unrelated grounds. *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015).

In *Rodriguez*, the Supreme Court held that "[a] seizure justified only by a police-observed traffic violation" becomes unlawful if it is extended beyond the time needed to address that violation. 575 U.S. at 350. The Fourth Amendment tolerates investigations unrelated to the traffic stop that occur during the stop, but only if those unrelated investigations do not prolong the stop. *Id.* at 354 (citing *Arizona v. Johnson*, 555 U.S. 323, 327-28 (2009), and *Caballes*, 543 U.S. at 406, 408). However, prolonging the stop is still permissible if there is reasonable suspicion to do so on grounds unrelated to the traffic stop. *Whitley*, 34 F.4th at 529.

The activities incident to a traffic stop include things like checking a driver's license, insurance and registration, checking for warrants, and deciding whether to issue a citation. *Rodriguez*, 575 U.S. at 355. In contrast, activities like dog sniffs have a separate purpose—detecting criminal activity—and are thus divorced from the purpose of the traffic stop. *Id.* (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)). Therefore, dog sniffs and other unrelated activities are permitted, but they must occur "during the supposedly dead time while [the officer] or another officer is completing a task related to the traffic violation." *United States v. Howard*, 815 F. App'x 69, 75 (6th Cir. 2020). Because the unrelated activity happens concurrently with the traffic stop activities, the unrelated activity does not add to the total time of the stop. *Id.*

Here, Vanderpool relies on *Rodriguez* to argue that the dog sniff did not just prolong the traffic stop, it halted it completely. (R. 68 at Page ID 570). The Sixth Circuit has taken different

11

approaches to interpreting and applying *Rodriguez*, so the Court will analyze this case under both standards.

### 1. Outcome under the *Salas* approach

Though *United States v. Salas* is an unpublished case, the facts mirror the instant case so closely that the holding is at least persuasive to the outcome here. In *Salas*, an FBI agent worked with a confidential informant to surveil a drug trafficking operation. 820 F. App'x 405, 406-07 (6th Cir. 2020). After getting a tip about a drug delivery, the agent arranged for federal, state, and local officers to intercept the delivery. *Id.* at 407. Local police pulled the suspected vehicle over for some minor traffic violations. *Id.* The traffic stop led to a dog sniff, which led to a search, which led to drugs, which led to the defendant's arrest. *Id.* at 408-09.

The defendant, relying on *Rodriguez*, moved to suppress the evidence of the search. *Id.* at 409. The Sixth Circuit found that *Rodriguez* was distinguishable because, although it also involved a traffic violation, there was nothing beyond that traffic violation to justify the stop that led to the dog sniff. *Id.* at 412. The court pointed out that *Rodriguez* prohibited extending traffic stops beyond the time needed to issue a ticket, but that rule applied to "seizure[s] *justified only by a police-observed traffic violation*[.]" *Id.* (quoting *Rodriguez*, 575 U.S. at 350) (emphasis in original). And in the defendant's case, the seizure was justified by more than just the traffic violation. It was not a routine traffic stop but "an extensive investigation into an ongoing drug enterprise." *Id.*

If the *Salas* approach is applied, then *Rodriguez* is distinguishable from Vanderpool's case. As in *Salas*, Vanderpool's seizure was not "justified only by a police-observed traffic violation," *Rodriguez*, 575 U.S. at 350, but instead "arose out of an extensive investigation into an ongoing drug enterprise," *Salas*, 820 F. App'x at 412. At the evidentiary hearing, Cincinnati DEA agents

12

testified to the ongoing drug trafficking investigation where Vanderpool had been identified on multiple occasions before the date of his arrest. (R. 62 at Page ID 220). On the day of Vanderpool's arrest, the agents identified activity consistent with drug trafficking. (*Id.* at Page ID 248). Because of the ongoing drug investigation that included Vanderpool, *Rodriguez*'s prohibition on prolonging traffic stops beyond the time needed to issue a ticket would not apply.

### 2. Outcome under the *Whitley* Approach

In *Whitley*, the Sixth Circuit found that officers had "abandoned the mission" of the traffic stop when they lawfully pulled over the defendant for a traffic violation but failed to examine his documents, run his name through a database, or further investigate the traffic stop. *Whitley*, 34 F.4th at 530. Instead, the officers pursued a drug investigation based on a digital scale observed in the defendant's lap. *Id.* at 527. The defendant refused to get out of the car for about 20 minutes. *Id.* When he did eventually get out, the police arrested him for "hindering" and "opposing" their investigation. *Id.* Following the arrest, the officers deployed a K-9 to perform a sniff of the car, and a subsequent search revealed marijuana, a handgun, and almost $7,000 in cash. *Id.* The defendant moved to suppress that evidence. *Id.* at 528.

Unlike *Salas*, *Whitley* did not consider the language in *Rodriguez* limiting that case to seizures justified only by a traffic violation. *Id.* Though *Whitley*'s seizure contained additional justification from the ongoing drug investigation, the Circuit applied the *Rodriguez* framework anyway, holding that when officers have abandoned the purpose of the original traffic stop, independent reasonable suspicion is required to lawfully continue the stop. *Id.* at 522. The Circuit found that the officers had established reasonable suspicion of drug trafficking and therefore had an independent basis to continue the traffic stop. *Id.* at 535. The previously received information of a sale of heroin from a confidential informant supported reasonable suspicion, as well as the

13

reports that detectives had witnessed the defendant leaving a location with a large wad of cash before traveling to the location of the heroin sale, witnessed the defendant entering and exiting a Family Dollar and a liquor store without making any purchases, and witnessed the defendant move a black bag from the passenger side of the vehicle and into the trunk. *Id.* at 533. In addition, during the traffic stop, the officers observed a digital scale sitting in plain view of the officers. *Id.*

Applying the standard from *Whitley* to this case requires the Court to evaluate Vanderpool's circumstances under *Rodriguez*: Did the officers here prolong the traffic stop by abandoning the purpose of that stop? And if yes, did the officers have reasonable suspicion to do so?

### a. The officers abandoned the traffic stop.

The first question is whether the dog sniff of Vanderpool's vehicle happened "within the proper duration and scope of a traffic stop." *Whitley*, 34 F.4th at 530. At the beginning of the traffic stop, the officers' actions were within the proper scope and duration of the stop. The officers initiated the traffic stop of Vanderpool because he had failed to signal twice leaving the Kroger parking lot. (R. 62 at Page ID 305). Officer Hartke testified that Vanderpool was removed from the vehicle because he saw Vanderpool making movements through the car windows and was concerned for his safety. (*Id.*). Following Vanderpool's removal, Thornberry ran Vanderpool's license through dispatch. (*Id.* at Page ID 288). But after completing those activities, Hartke initiated the dog sniff. (*Id.* at Page ID 308). Thornberry was present for the duration of the dog sniff, but did not do anything related to the underlying traffic stop while the sniff was occurring. (*Id.*). Therefore, there was no "dead time while [Thornberry was] completing a task related to the traffic violation" during which the dog sniff could have happened concurrently. *See Howard*, 815 F. App'x at 75. Because the dog sniff did not happen concurrently with anything related to the

14

traffic stop, it prolonged the duration of the stop. Instead of continuing with normal activities related to the traffic stop, the officers "had abandoned the traffic stop to investigate [Vanderpool's] drug-related activities, an investigation that required a source of reasonable suspicion unrelated to the traffic stop." *See Whitley*, 34 F.4th at 532.

### b. The officers had reasonable suspicion to continue the stop.

A police officer may briefly detain "a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). Reasonable suspicion requires more than a hunch, but less than a preponderance of the evidence. *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). The Sixth Circuit evaluates whether an officer had reasonable suspicion to support detention by examining the "totality of the circumstances." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). A court must "determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 9 (1989)).

Here, the Government points out that the DEA had shared information with Officers Hartke and Thornberry about Vanderpool's suspected drug transactions. (R. 62 at Page ID 252). This alone would "cause the officer[s] to have a reasonable and articulable suspicion that criminal activity [was] afoot." *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020); *see also United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (DEA surveillance of car and occupants engaged in suspected drug transaction sufficient to establish reasonable suspicion). Second, Officer Hartke observed Vanderpool digging around in the passenger side, center console, and backseat of his vehicle indicating that he was either searching for a weapon or trying to hide evidence. (*Id.* at 305-

15

06). The combination of the information from the ongoing drug trafficking investigation combined with Vanderpool's activity inside his car after the officers stopped his vehicle supports a finding of reasonable suspicion to continue his detention.

The Government also relies on *United States v. Graham* to argue that the officers had reasonable suspicion to continue their investigation. (R. 69 at Page ID 590-91) (citing 483 F.3d 431, 438-41 (6th Cir. 2007)). *Graham* applies in situations where officers have reasonable suspicion that a suspect is armed and dangerous. *Id.* at 438. Officers may search a vehicle for weapons if they have a reasonable belief "that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* (quoting *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)). That can happen even if the suspect is already out of the vehicle because officers might reasonably believe that upon *reentering* the vehicle, the suspect would have access to a weapon. *Id.* at 440.

*Graham*, however, is not exactly on point for this case. Once Vanderpool was out of his vehicle, he was not going to get back into the vehicle because the officers arrested him, and they would have done so even without evidence of his drug crimes. Hartke and Thornberry testified that Vanderpool's driver's license was not reinstated, that Vanderpool had failed to notify the state of his new address, and that both of these are arrestable offenses under Kentucky law. (R. 62 at Page ID 287-88, 307-08); *see* Ky. Rev. Stat. §§ 186.620, 186.435. Hartke also testified that there was an arrest warrant for the registered owner of Vanderpool's vehicle. (*Id.* at Page ID 283). Vanderpool's arrest citation noted that, in addition to the drug crimes, Vanderpool was arrested for failing to signal, lack of a valid driver's license, and failing to notify the state of an address change. (R. 58 at Page ID 876). Vanderpool would have been arrested even if Hartke never found the drug evidence in his vehicle; therefore, the risk that concerned the court in *Graham*—that the suspect might reenter his vehicle and grab a weapon—was absent here. Nevertheless, Officer

16

Hartke and Sgt. Thornberry still had reasonable suspicion to prolong the stop on the basis of the DEA's drug investigation.

### B. K-9 Dog Sniff

Vanderpool's second argument for suppressing the evidence found in his vehicle is that the K-9 dog sniff did not provide probable cause for the officers to search the vehicle. (R. 68 at Page ID 573). As noted above, a drug dog's "alert" is an untrained response to an odor the dog is trained to detect. (R. 66 at Page ID 365). It is a behavioral change such as a change in breathing, gait, tail wagging, or body posture. (*Id.*). In contrast, a drug dog's "indication" is a trained response to an odor the dog is trained to detect. (*Id.*). An indication can be passive, like sitting or lying down at the spot where the dog smells the odor, or active, like scratching or biting to try and get to the source of the odor. (*Id.* at Page ID 420-21).

"The automobile exception permits officers to search a vehicle without a warrant if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *Whitley*, 34 F.4th at 535-36 (quoting *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019)). A dog's positive alert to narcotics can serve as probable cause to search "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting." *Florida v. Harris*, 568 U.S. 237, 246-47 (2013). Vanderpool notes, however, that the presumption is rebuttable. *Id.* Here, the K-9 was certified by NAPWDA, so his alert was presumptively reliable to provide probable cause. (R. 66 at Page ID 394).

Vanderpool argues that the K-9 either did not alert, or that the circumstances of the sniff made the alert unreliable. (R. 68 at Page ID 574-76). The argument that the K-9 did not alert stems from Heyen's expert report, which simply said, "K-9 Keno did not alert during the sniff of Defendant Vanderpool's vehicle." (*Id.* at Page ID 574). Heyen relied on video footage from

17

Hartke's body camera in coming to that conclusion and was not present for the search. (R. 66 at Page ID 450-51). As the Government's rebuttal expert John Brannon noted, the K-9's handler (Officer Hartke) is in a much better position to determine when the K-9 exhibits a change of behavior that could signal an alert. (R. 66 at Page ID 535).

Vanderpool also challenges the circumstances of the sniff. Specifically, he says that the K-9 showed no narrowing or intensity during the sniff, and had to be redirected back toward the vehicle because he kept pulling away to go in some other direction. (R. 68 at Page ID 575-76). When assessing the reliability of drug dog alerts, the Sixth Circuit focuses on the dog's accuracy rate and whether there is a history of false alerts. *See, e.g.*, *Hernandez v. Boles*, 949 F.3d 251, 259 (6th Cir. 2020) (dog reliable because there were no false alerts); *United States v. Hunt*, 718 F. App'x 328, 332-33 (6th Cir. 2017) (noting dog's history of false alerts); *United States v. Patton*, 517 F. App'x 400, 403 (6th Cir. 2013) (dog reliable because of its 90% accuracy rate). Here, the testimony showed that the K-9 had never had a false negative in the field, and his accuracy rate is greater than 95%. (R. 66 at Page ID 403-04). Therefore, his alert in this case was reliable and provided probable cause to search the vehicle.

Vanderpool next argues that the K-9's indication rate fell from 80% to 4% in the time after completing his certification, indicating that the K-9 was not completing "maintenance training" to maintain its reliability. (R. 68 at Page ID 578). He suggests that allowing police to conduct searches based only on a drug dog alert, without an indication, would allow police to act on hunches. (*Id.* at Page ID 577). But the Supreme Court has said that an alert is sufficient to provide probable cause. *See generally Harris*, 568 U.S. 237; *see also United States v. Boxley*, 373 F.3d 759, 761 (6th Cir. 2004) (citing *United States v. Buchanon*, 72 F.3d 1217, 1219 n.1 (6th Cir. 1995)) ("We recognize that an alert in the context of a canine narcotics sniff indicates that narcotics are

18

present in the item being sniffed or have been present in such a way as to leave a detectable odor."). Vanderpool does not provide any case law that requires K-9 units to indicate at a certain threshold to be reliable. Instead, he simply asserts that the K-9 did not receive "proper" maintenance training to give objective indications, and therefore he cannot provide the officers with information to establish probable cause. (R. 68 at Page ID 580). While Vanderpool did provide an expert witness in K-9 training, Heyen testified that he does not follow the standards set by national organizations like NAPWDA because he does not agree with their methodology. (R. 66 at Page ID 475-77). Instead, his opinions were based on standards from the German police. (*Id.*). Further, Heyen has not served in a law enforcement role since 1991, and could not identify any law enforcement organizations that used his preferred methods. (*Id.* at Page ID 477). In contrast, the United States sufficiently rebutted Heyen's testimony with that of John Brannon, a former K-9 handler with experience as recent as 2016. (*Id.* at Page ID 532). Brannon also testified to the reliability of NAPWDA standards. (*Id.* at Page ID 532-36).

Until the Supreme Court or the Sixth Circuit requires K-9 units to indicate, or otherwise holds that a K-9 alert is not enough to establish probable cause, this Court must find based on the facts presented and existing case law that the K-9 alert was sufficient. The fact that the K-9 alerted to narcotics in Vanderpool's vehicle, rather than indicating, is not sufficient to grant his Motion to Suppress (R. 19).

### III. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, Vanderpool has not demonstrated that he is entitled to the suppression of evidence obtained during the traffic stop that led to his arrest. Accordingly, **IT IS RECOMMENDED** that Vanderpool's Motion to Suppress (R. 19) be **denied**.

Specific objections to this Report and Recommendation must be filed within fourteen (14) days of the date of service or further appeal is waived. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(2); *Thomas v. Arn*, 474 U.S. 140, 142 (1985); *United States v. Walters*, 638 F.2d 947, 950-51 (6th Cir. 1981).

Signed this 31st day of March, 2023.



Signed By:
*Candace J. Smith*
United States Magistrate Judge

J:\DATA\Orders\criminal cov\2021\21-66-DLB-CJS R&R re mtn to suppress.docx